IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

MAR 02 2023

JEFFREY P. COLWELL
CLERK

Civil Action No.    1:22-cv-03110-CNS-NRN

(To be supplied by the court)

NASER ABDO , Plaintiff

v.

United States ,

Lt. Kamnrad ,

Lt. Ingram ,

Officer Balsick (see attached) , Defendant(s).

(*List each named defendant on a separate line. If you cannot fit the names of all defendants in
the space provided, please write "see attached" in the space above and attach an additional
sheet of paper with the full list of names. The names listed in the above caption must be
identical to those contained in Section B. Do not include addresses here.*)

---

## PRISONER COMPLAINT

---

### NOTICE

Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from
public access to electronic court files. Under this rule, papers filed with the court should not
contain: an individual's full social security number or full birth date; the full name of a person
known to be a minor; or a complete financial account number. A filing may include only: the
last four digits of a social security number; the year of an individual's birth; a minor's initials;
and the last four digits of a financial account number.

**Plaintiff need not send exhibits, affidavits, grievances, witness statements, or any other
materials to the Clerk's Office with this complaint.**

2

Officer Quezada

Bureau of Prisons

Office of Luitenant or Captain

3

**A.    PLAINTIFF INFORMATION**

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address. Failure to keep a current address on file with the court may result in dismissal of your case.*

Naser Abdo, 80883730, USPenitentiary Max, PO Box 8500, Florence, CO, 81226
(Name, prisoner identification number, and complete mailing address)

_____
(Other names by which you have been known)

*Indicate whether you are a prisoner or other confined person as follows: (check one)*

____    Pretrial detainee
____    Civilly committed detainee
____    Immigration detainee
____    Convicted and sentenced state prisoner
_X_    Convicted and sentenced federal prisoner
____    Other: *(Please explain)* _____

**B.    DEFENDANT(S) INFORMATION**

*Please list the following information for each defendant listed in the caption of the complaint. If more space is needed, use extra paper to provide the information requested. The additional pages regarding defendants should be labeled "B. DEFENDANT(S) INFORMATION."*

Defendant 1.  Attorney General, 10th and Constitution, Main Justice Bldg.,
              (Name, job title, and complete mailing address)

              Room 5111, NW Washington, DC, 20530 (The U.S.)

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law?  _Y_ Yes ___ No *(check one)*.  Briefly explain:

_____

_____

Defendant 1 is being sued in his/her ___ individual and/or ___ official capacity.

2

4

Defendant 2. Kammrad, Lt., USP Max, PO Box 8500, Florence, CO, 81226
(Name, job title, and complete mailing address)

_____

At the time the claim(s) in this complaint arose, was this defendant acting under
color of state or federal law? __X__ Yes ___ No (*check one*). Briefly explain:

_____

_____

Defendant 2 is being sued in his/her ⬤ individual and/or __X__ official capacity.

Defendant 3. Ingram, Lt., (same as Defendant #2)
(Name, job title, and complete mailing address)

_____

At the time the claim(s) in this complaint arose, was this defendant acting under
color of state or federal law? __X__ Yes ___ No (*check one*). Briefly explain:

_____

_____

Defendant 3 is being sued in his/her ⬤ individual and/or __X__ official capacity.

(See attached)

## C.   JURISDICTION

*Indicate the federal legal basis for your claim(s): (check all that apply)*

____   42 U.S.C. § 1983 (state, county, and municipal defendants)

⬤   *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971)
     (federal defendants)

__X__   Other: (*please identify*) 28 USC § 1331; 28 USC §§ 1346(b), 2671-80; 28 USC § 1367

5

Defendant 4: Officer Balsick, (same address as Defendant #2) (all other info.
is the same as Defendant #2 except he is only being sued in his
official capacity).

Defendant 5: Officer Quezada, (all info is the same as Defendant #2
except he is only being sued in his official capacity).

Defendant 6: Bureau of Prisons, Office of General Counsel, Federal BOP,
320 First st., NW, Washington, DC, 20534. This is obviously
official capacity.

Defendant 7: Office of Luitenant / Captain, (all info is the same as
Defendant #2 except the suit is only an official capacity one.

6

**D.    STATEMENT OF CLAIM(S)**

*State clearly and concisely every claim that you are asserting in this action.  For each claim,
specify the right that allegedly has been violated and state all facts that support your claim,
including the date(s) on which the incident(s) occurred, the name(s) of the specific person(s)
involved in each claim, and the specific facts that show how each person was involved in each
claim.  You do not need to cite specific legal cases to support your claim(s).  If additional space
is needed to describe any claim or to assert additional claims, use extra paper to continue that
claim or to assert the additional claim(s).  Please indicate that additional paper is attached and
label the additional pages regarding the statement of claims as "D. STATEMENT OF CLAIMS."*

CLAIM ONE: ____See attached_____

        Supporting facts:

4

7

## D. STATEMENT OF CLAIMS

The "Assessment Claims", claims 1-2

## FACTS

1. At all relevent times in this Complaint I was a prisoner at the ADX.

2. On 6-25-21, I was on the 35th day of a hunger strike.

3. In the morning, medical staff came to my cell to conduct a medical assessment.

4. The staff member was upset over other issues & began cursing me in irate fashion.

5. He threatened me saying, "don't fuck with my department or i'll fuck with you." Upon leaving he said, "don't be a bitch, take the gas."

6. The "gas" referrences a non-lethal munition often used to extract recalcitrant inmates from cells during uses of force. See genrally BOP Policy 5566.06 (on uses of force).

7. During mandated medical assessments, to which an inmate may refuse in assertion of his Fifth Amedmant rights/ Eighth Amendments, a "use of force team" will be assembled to effectuate the assessment & extract the inmate. See genrally BOP Policy Hunger Strikes 5562.05

8. I did not reciprocate in kind, remaining calm I said that i'd comply with the "use of force team" when they come for the assessment.

9. The "team" arrives later and I cooperate with them and submit to restraints.

10. At no time did I violate policy, become violent, make sudden movements nor become any manner of physically aggressive.

11. During the assessment, I refuse medical treatment, including to be wieghed.

12. Lt. Baton ordered staff, "place Abdo on the scale."

8

13. After Lt. Batson witnessed my refusal of medical care by way of me sliding my legs from the scale, he paused for 15-30 seconds and ordered the 'team' to "place Abdo on the ground."

14. I was in full black box ambulatory restraints and shackles with 2-3 staff holding me.

15. The team then take me down to the ground hard and raise my legs up behind me as if to 'hog tie' me by crunching up my body into a 'pain position.' My face was crushed to the ground, while what felt like several knees or limbs grind into my back & body.

16. The officers continue to ratchet my legs and ankles in the precarious position they're in untill it feels as if they may snap my ankles by forcing them beyond the joints' range of motion.

17. The immovable black-boxed cuffs, due to the box, do not allow the cuffs to adjust. The cuffs secured by the black box are at all times perpendicular to the rectangular bar running through them; this means that as several officers raise up my lower body & crush my upper body into the floor, all that wieght becomes focused on my wrists, bones, ligaments and nerves as they are forced to 'give way' between the downward pressure and the unforgiving floor.

18. All of this causes searing, burning, sharp and non-specific pain all over my body but specifically grating and excruciating at my wrists, hands, back and ankles. Some of this pain recedes in a few hours, but numbness and nerve pain (burning) persist for weaks, the worst of it decreasing alot in frequency after ~~several~~ days, all except the numbness.

19. It is hard to quantify the humiliation of being treated like an animal in an entirely gratuitous use of force; I can only say that I was deeply humiliated & angry having my face crushed to the ground.

20. The danger of serious injury in applying pressure to hand cuffs is apparent from policy that warns against inmates being "carried" by hand cuffs. See BOP Policy 5566.06 at (6)(e)

9

(use of force).

21. Staff never made any sudden movements as if to respond to an assault; the only sudden movement made was to take me down at the Lt.'s command.

22. At no time did any staff member give me any order to stop resisting staff and/or assaulting them, as one might expect officers to do when assaulted.

23. It is a part of officer training and practice to give direct orders to assaultive inmates to cease their behavior.

24. Lt. Batson then asks, "Abdo, will you comply... and give a wieght?"

25. Humiliated and upset at this point, I shout loud enough for the camera to hear, "No, nor am I going to provide a urine sample; the nurse should have done [the medical assessment] this morning."

26. I continue to refuse all medical care untill the assessment ends, including not reporting any pain or injuries.

27. I know that this particular nurse, the same one from that morning, will not accurately record or treat any of my complaints; so I remain silent.

28. Several hours later, another nurse examines my wrist & arms using a flashlight in the dimness of my cell.

29. She provides me 2 packets of anti-biotic oil for the abrasions and cuts on my forearms and wrists.

30. Later, staff fabricated an incident report against me in order to justify the assault. This is a common tactic. Almost every report ever written against me of "kicking" staff was either expunged or the subject of the previous, and my only lawsuit, which was privately settled. Actually, it is every report.

31. The video was will show that staff only took me down by the Lt.'s order and that staff did not react to any alleged "kick".

32. It is a part of officer training that an assaultive inmate is to be immediately immobalized.

10

33. Force was used for no penological purpose, specifically to intimidate me into weighing myself for asserting my right to refuse treatment under the Fifth Am.

34. Moreover, staff were upset that I did not "take the bait" earlier that morning by getting gassed and sought to fabricate an assault in order to batter (because) and humiliate me. Thankfully I did not resist them or else it may have been much worse.

35. I believe the video will show my body as very still revealing no kick at all by inference, if not direct evidence. I incorporate the camera footage from that use of force here.

36. In my administrative tort (TRT-NCR-2022-02906) I requested preservation of C-Unit's C-Lower Range cameras from 4pm-8pm on 6-25-21.

37. I submitted an SF-95 Form grieving the above issue facts on 1-31-22 by certified mail no. (7018-1130-0002-2161-5099).

38. On 5-24-22, tort 02906 was denied. I don't know when it was mailed.

39. I submitted 3 requests for reconsideration by certified mail; No. 1 7021-2720-0000-8550-6834, "presented" on 9-15-22; No. 2 7022-2410-0001-4497-5064, "presented" on 11-21-22; No. 3 7022-2410-0001-4497-6061 mailed 11-14-22 but as of 12-20-22, still "in transit." Requests no. 1 & 2 were "presented" to the Regional and Central Offices General Counsel respectively.

40. I submitted 3 more requests for reconsideration by regular mail, which were mailed on 10-25-22, 11-9-22, and 11-10-22.

41. Not having received any confirmation that the reconsideration was being processed, on 11-23-22, out of an abundance of caution, I "filed" my Complaint as to these aforementioned Claims One and Two via the prisoner "mailbox rule."

42. On 12-30-22, I received the reconsideration denial of this 02906 administrative claim.

The "Pre-Assault" Claims, claims 3-12.



FACTS

43. On 7-2-21 I was on the 42 day of my hunger-strike.

44. At 9 am, I was 'forcibly' given an I.V. of water at medicals order. 'Forcibly' means a 'team' was assembled and I complied under threat of force to accept an IV after having asserted rights to refuse treatment.

45. By this time, I had been in restraints for 53 hours, appx., refusing to come out, "untill I [spoke] with someone from the OIG or Regional Office" about ADX's free fall in its conditions and services post covid.

46. Refusing to leave restraints is a common form of prisoner protest used to raise issues to administrators and have those issues taken seriously.

47. By this time, i'd already been under 24 hour medical observation due to the extended strike and had lost 40-50 pounds, being about 130 pounds then.

48. I was in full ambulatory restraints with shackles and a 'black box.'

12

49. In the medical cell, up against a wall, staff attempt to remove the shackles.

50. In order to effectuate the protest, I non-combatively move my leg away from the officer who is trying to remove them.

51. I also shout that I will refuse to come out of restraints so the camera can hear me.

52. Later, I would be given a fabricated incident report for "kicking" staff, but this report, like the other one, infra ¶132 (following battery incident), would be expunged and I be found not guilty. Cf. supra ¶30 ("kicking" is a common allegation used to justify uses of force in the BOP).

53. At no time did I ever become physically aggressive with staff.

54. Lt. Kammrad then "four points" me, i.e., chains each of my limbs to four bars at the ends of the bed. He was in command at that time.

55. My left hand was cuffed contrary to directives, manuals, training, post-orders and policy.

56. My left hand was cuffed above my shoulder with the hand turned away from the body & toward the keyhole of the cuff. I was placed supine.

57. This position is untenable for any length of time because it requires the constant contraction of the muscles and tendons in the forearm, upper arm and shoulder. To be sure, any part of the human body that is chained in an akward position that activates a muscle group continuously will very quickly lead to tortuous and sadistic pain. Even an arm chained to a bar on the ceiling will cause madness inside of 1 hour.

58. Making more murderous the condition of my left arm, the medical tape used to secure the cottonball to ~~the IV site~~ the IV site on my left arm was very tightly applied.

59. Staff did not remove the ~~cotton~~ medical tape.

13

60. The failure and subsequent refusals to remove the medical tape, coupled with the misapplication of the left restraint and subsequent refusals to adjust it, directly resulted in unimaginable burning sensations and extreme soreness. The extreme soreness, if that isn't minimizing the pain, was so bad I cried out in pain at the slightest movement. It is akin to a combination of a severe oft-recurring cramp with any movement alongside a raging fire when static and still. It felt as if my arm and shoulder were put over a live fire. Both of these acts of negligence were the 'perfect storm' and resulted in my torture and suffering.

61. This lasted for 7-8 hours with no intervention.

62. At no time did staff, until 7-8 hours later, offer to adjust the restraints, or to let me out of restraints.

63. At the first 2 hour 'restraint check', see B.O.P. Policy 5566.06 (10)(d) (on nature of restraint checks and duties), Lt. Kammrad refused to adjust the restraints or remove the tape, he said he doesn't "do anything on [this] first restraint check."

64. At the second check, he refuses to do anything.

65. At this time, my arm was beginning to turn blue and purple due to lack of circulation.

66. Lt. Ingram refuses to do anything at the third 'restraint check'.

67. During these hours of restraint I periodically scream over the pain I elicit as I move my left arm trying to increase circulation and ease the burning.

68. At one point, perhaps six hours into the ordeal, the Health Services Admin. hears me and enters the cell with officer Gomez.

69. Just as I explained to the Luitenants, I tell her whats going on with my left arm finishing with, "something is wrong."

70. Ms. Fellows says she will "call the Luitenant" and leaves.

14

71. She returns later and say's, "he'll be back at 4 pm."

72. About 1 hour later, Lt. Ingram returns and cuts off the medical tape. He then correctly applies the hand cuff. My hand had become lodged at the wrist into the cuff like a vice grip. Lt. Ingram had to pull the wrist out of the cuff before he could re-apply it, using significant force in doing so.

73. I felt immediate relief.

74. In between these 2 hour 'restraint' checks, staff conducting the 15 min-ute checks "to ensure that the restraints are not hampering circulation", 28 CFR§552.24 (d), ~~staff~~ refused to call medical or a luitenant to address the circulation issues, nor did they render aid themselves.

75. Staff did not enter the medical cell to check my circulation or assess my condition at any time during these 15 minute checks.

76. Policy and training instruct officers to cuff inmates hands with their wrists facing out, away from the keyhole.

77. An SF-95 form was 'presented' to the Regional Office by certified mail no. (7018-1130-0002-2161-5099) grieving the aforementioned facts on 1-31-22.

78. On 6-6-22, administrative claim TRT-NCR-2022-02907 was denied, on 6-14-22, the final denial was mailed.

79. Because I appealed the final denial of claim 02906 and 02907 in the selfsame letter, I incorporate all exhaustion claims for 02906, see supra ¶¶39-40, here for 02907.

80. On 6-21-22, I sent to the Regional Office an isolated appeal for claim 02907 by regular (legal) mail.

81. On 12-30-22, I received a denial for reconsideration of claim 02907.

82. The BOP conflated both claims, 02906 and 02907, in both the initial denial and the reconsideration denial.

83. Despite BOP legal subterfuge, claim 02907 is fully exhausted.

15

The "Assault/Post-Assault" claims, claims 13-18.

## FACTS

84. By this time, I had been in restraints, either full black box ambulatory or four point, for 60 hours, appx.

85. There were two stationary medical cell cameras & 1 hand held camera in operation during this incident.

86. On 7-2-21 at 6pm, I was still 'four pointed'.

87. At 6 pm, Lt. Ingram with a camera, supervising Lt. Kammrad, and three officers, Law, Balsick and Quezada enter the cell to transition me into ambulatory restraints.

88. I had agreed at 4 p.m. to transition.

89. After sixty hours in restraints, and in large part due to the repeated misapplication of restraints, my wrists were in bad shape.

90. My wrists were swollen, lacerated and purple/blue indentation marks could be seen in concentric circles about the wrist. I was in alot of pain.

91. The black box is of a nature to force cuff to wrist contact, non-stop; however, while this fact alone will cause horrid pain, chaffing and eventually lacerations and accrue damage over time, a tightly applied black box, ~~by the way,~~ a misapplication of the restraints cuff to wrist spacing rule i.e., referred to as the finger rule or the two finger rule, will cause immense and constant pain to an already swollen, lacerated and sensitive wrist that had been ~~vice gripped~~ 'vice gripped' regularly

92. Had the rule been applied, a bearable amount of pain would have resulted. For example, the black boxed right wrist was in a much more favorable pain situation compared to the left wrist, as you'll see.

93. Lt. Kannrad applies the black-box restraints but violates the cuff to wrist spacing rule and applies the left restraint entirely too tight. He fails to apply the rule causing the left restraint to grate into my wrist at several points. He had actually tightened the left restraint compared to how it had been applied just 2 hours earlier.

94. I asked Lt. Kannrad to loosen the restraints and he refused.

95. Lt. Kannrad had already misapplied the restraints over the previous twelve hours causing arduous torture and agony and subjecting me to the risk of medium to long term nerve damage. "Misapplied" here encompasses refusing to ensure circulation generally.
*(paper spacing application)*

96. Lt. Kannrad was intentionally targeting the same wrist (left) as he had ███████ been deliberately indifferent and reckless with the previous twelve hours, supra ¶¶ 93-83, intending to cause unbearable pain. He was trying to teach me a lesson about the 'consequences' of protesting by restraints so that I would eventually agree to come out of restraints. He tried to torture me with full knowledge. He provoked pain unjustly.

97. Lt. Kannrad may have been trying to provoke violent resistance.

98. At all times, I was mechanically restrained at legs and hands.

99. I was in an untenable and impossible situation. I could have only continued the agony of the misapplied left restraint for an untold number of hours, Cf. supra ¶¶ 61-62 (7-8 hours in clear distress with no relief or assistance), or non-combatively resist the medical assessment in order to be put back in a 'four pointed' supine position that had been much less painful over the past two hours, or would otherwise likely be simply because the left restraint was simply too tight and any reapplication of the restraints could not get any worse, or so I thought. # Famous last words.

100. The pain and the prospect of several hours of pain forced me to non-combatively resist.

101. I had never resisted the placement of restraints before.

17

102. While mechanically restrained, with my body in a bent over sitting position and my head being held in between my legs, I move my upper body to the right and left, never striking anyone. I jostled my torso to avoid the application of restraints.

103. This lasted only for 1-2 seconds and then I ceased all movement.

104. At this time, Balsick grabs my throat and drags me across the bed.

105. Balsick digs his fingers & knuckles deep into my throat and crushes my adam's apple, leaning onto it. He is choking me.

106. He releases and then continues choking me.

107. As he does this, Law is holding my legs, and Quezada the the black boxed cuffs high into the air as he ratchets them toward the ground. This threatens to break my wrists because the black-box acts as a fulcrum, therefore when he ratchets them perpendicular to my wrists, the black-box crushes my hands inward towards my inner forearms, the entire time grinding the cuffs into skin, muscle, ligament, tendon and bones. Quezada is forcing the wrists beyond their range of motion. Quezada is either trying to break my wrists or in his excessive force just doesn't care.

108. The entire time, i'm screaming but not moving.

109. Lt. Kammrad, in fairness to him, walks over to staff and taps one of them on the shoulder then orders them to, "control yourself", or "ease up"

110. The battery then stops.

111. I ask the camera to record my wrists and neck but the cameraman does not do so.

112. The nurse does a superficial 3-second "exam" and then leaves.

113. The nurse did not adequately record any marks on me.

114. Under 28 CFR §552.26(b), after applying restraints & using force, nurses are obligated to do an exam, identify and treat any injuries, etc...

115. My 'adam's apple' felt dislodged, tending right of center.

18

116. Four pointed', with great difficulty, I am able to reach my right hand's fingers left as I stretch my head right in order to continue pushing my 'adam's apple' back into place. It takes several times before I feel it has worked. It seemed to return right of center for a while.

117. For the next 10 days' or so, I have trouble swallowing even water. Every swallow felt like I were swallowing an edged rock.

118. I must have strained some muscle because for about 6-8 hours I felt excruciating pain in my ribcage, on the right side, which sent sharp pains up through my neck, also on the right side. The pain was elicited with slight movements, whether it be my head or my right arm. Initially, I was sure that a rib had been cracked.

119. I explain this to a nurse at some later time, and she performs an exam and says that she doesn't feel a cracked rib, but that I may have strained a muscle.

120. This tenuous and fragile 'strained muscle' was causitive of much pain, because rather than just lying still and giving my very emaciated, dehydrated, and physically deteriorated hunger strike body a rest, I was forced to constantly move my right wrist that had been 'vice gripped' by the cuff. This elicited the pain frequently.

121. The officers, again, misapplied the restraints, this time on the right side. The cuff literally 'vice gripped' my wrist in clear contravention of the 'finger rule' or the 'two finger rule'.

122. Over the next two hours, I struggle and scream as I try to wrench my wrist out of the vice grip, all of which excites my rib strain.

123. At 8pm, Lt. Ingram returns with an officer, nurse and camera to do a 'restraint check'.

124. The cuff was locked so tight about the wrist that even with the cuff open, and even with Nurse Dunn pulling my wrist, it still takes a few seconds to dislodge my wrist.

125. While I was grateful to the nurse, I could not help but scream as she worked to dislodge my wrist because for two straight hours 'the cuff had vice gripped my

19

wrist down to the bone. I would even hazard to say that this instance of misapplication was tighter than any other i'd ever known.

126. Immediate relief followed afterwards from the worst of the pain.

127. At no time during the '15 minute checks' did staff assess my restraints or respond to my cries for help.

128. At all times during the '15 minute checks' were staff conducting their 'checks' from outside the cell door, which was 15 feet from where I was 'four-pointed.'

129. Staff could not have assessed my "circulation" or "general welfare," BoP Policy 5566. 06 (10)(d) (incorporating 28 C.F.R.§ 552.24), from 15 feet.

130. This equally applies to the aforementioned claims as the 'checks' occured in the same cell and from the same distance. See supra ¶¶43-83 (the 'pre-assault' claims).

131. I would later be given a fabricated incident report for 'kicking' staff in order to justify the battery.

132. The incident would later be expunged and I would be found not guilty. Cf. ¶52 (a previous allegation of 'kicking' expunged), ¶30 ('kicking' a common staff fabrication to justify malicious, unpenological force).

133. While still in medical, and immediately after being released from restraints, I showed the cell cameras my wrist and neck lacerations, bruises and marks.

134. Within days of these incidents that occured on 7-2-21, supra ¶¶43-130, I requested preservation of all video evidence through grievances.

135. All issue facts were properly exhausted via the selfsame documents and in the selfsame letters as those for the previous 7-2-21 'pre-assault' claims. I incorporate those paragraphs here. See supra ¶¶77-83 (referring to claim TRT-NCR-2022-02907).

FACTS RELATED TO THE PRE-ASSAULT /
THE INSTANT ASSAULT / POST-ASSAULT
CLAIMS

20

## FACTS RELEVANT TO THE 'PRE-ASSAULT' CLAIMS
## &
## THE INSTANT 'ASSAULT' / 'POST-ASSAULT' CLAIMS

136. I have never been placed in 'soft restraints' during my incarceration.

137. Policy requires inmates be placed in "hard restraints... only after soft restraints have proven ineffective." BOP Policy 5566.06 (6)(h)(3)(interpreting Regulation)

138. Emotional damages include pervasive and long-standing humiliation and rage that infiltrates ones being and causes an embedded and intrinsic misery and distress, lasting long after the incidents have ceased, that I am gratefully able to address and mitigate by means of my religion as well as other non-religious practices such as meditation, yoga and mindfulness.

139. As early as 7-13-21, a mere 11 days after the various 7-2-21 allegations occurred, BOP staff in the S.I.S department (internal investigations staff) received my BP-8 grievance request requesting preservation of all camera footage from the start of July, 2021 "up to and including 7-7-21."

140. I incorporate all handheld and stationary camera footage directly mentioned in this Second Amended Complaint herein.

141. There is a custom and practice at ADX of misapplying restraints in the manner of not using the 'finger rule' or the 'two finger' rule' as well as the improper placement of limbs whilst 'four pointed' and the 'vice gripping' of wrists.

142. There is a custom and practice at ADX in refusing to ensure restraints are not hindering circulation, causing unnecessary pain as well as refusing to render aid to those in distress while restrained and unable to care for themselves.

21

## CLAIM ONE: Battery & THE LAW APPLIED

143. Battery requires that the tortfeasor "acts intending to cause harmful or offensive contact with the person of the other... and an offensive [or harmful] contact... directly or indirectly results." White v. Muniz, 999 P.2d 814, 816 (Colo. 2000)(adopting Restatement (Second) of Torts '§18 definition).

144. "[W]illful and malicious injury [has the same elements as an] intentional tort of assault." Polanco v. Roth, 2014 Bankr. LEXSS 703, at #17 (Bankr. D. Colo. Feb. 21, 2014)(citing White, supra)

145. "The requirement of maliciousness is satisfied upon a showing that the injury was committed without just cause or excuse." Id at 14. Maliciousness means "'Wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill will' and malice may be implied 'by the acts and conduct of the [person] in the context of the surrounding circumstances.'" Id. at 21 (quoting Ball v. A.O. Smith Corp., 451 F.3d 66, 69 (2d Cir. 2006)). In determining one's mental state, "[c]ircumstantial evidence ... can pinpoint the thoughts in the mind of ~~another~~ another." White, 999 P.2d at 816. One may consider, "age, infirmity, education, skill or any other characteristic as to which the jury had evidence." Id. at 818.

146. In an Eighth Amendment context threats can help determine "the officer's subjective state." Bozeman v. Orum, 422 F.3d 1265, 71 n.11 (11th Cir 2005); Mann v. Failey, 578 F. App'x 267, 72 (4th Cir. 2014)(same). Also, where "there is no legitimate penological interest... the conduct itself is sufficient evidence [of] malice." Giron v. Corr. Corp. of Am., 191 F.3d 1281, 90 (10th Cir. 1999).

147. Factors in determining malice under the Eighth Amendment are
"[1] the need for ... force,
[2] the relationship between that need and the amount of force used,
[3] the threat reasonably perceived... and
[4] any efforts made to temper the severity of a forceful response"
Hudson v. McMillan, 503 U.S. at 7 (omitting the final factor of "degree of injury").

148. The Court should hold that the Eighth Amendment's subjective component and Colorado's battery intent component are equal, and that to find constitutional malice, one also finds, at the least, the malice of battery.

149. Defendant made ~~of~~ contact with my person and caused me injury and suffering. Supra ¶¶ 15-25, 29.

22

150. Defendant's conduct was malicious because they threatened me, supra ¶5, were upset that I didn't respond in a self-injurious way and sought to fabricate an assault in order to justify using force, supra ¶34.

151. Defendant's conduct was malicious because they violated several policies, which is to say Defendant's actions were entirely devoid of penological interest, and thus malicious. Defendant's actions were without just cause or excuse in these policy violations.

(a) 28 CFR§522.22, they used force "to punish an inmate." See supra ¶34; see also ¶30 (fabricated "incident report");

(b) 28 CFR§552.22(c), they used more force than "necessary to gain control of an inmate." See supra ¶¶14 (fully restrained), 16 (no physical aggression), 33-34 (no need for force);

(C) P.S. 5566.06, they used "physical violence [and] intimidation" (BOP policy). See supra: ¶¶5, 33-34 (intimidate to give wieght, conspire to batter).

(d) 3420.11, they used "physical violence [and] intimidation," and "profane... abusive language" (BOP Policy, Standards of Employee Conduct).

152. Defendant's conduct was malicious because it fails the "Hudson" test, supra.

153. Forcing handcuffed prisoners to the floor & kneeing them in the back states battery claim. McCallum v. United States, 2014 U.S. Dist. LEXIS 25173 (D. Colo. Feb. 26, 2014)

# CLAIM TWO: IIED & THE LAW APPLIED

154. IIED claims occur when "(1) the defendant engaged in extreme and outrageous conduct, (2) recklessly or with the intent of causing the plaintiff severe emotional distress, and (3) causing the plaintiff severe emotional distress." Pearson v. Kancilla, 70 P.3d 594, ¶1 (Colo. App. 2003).

155. "Conduct otherwise permissable may become extreme and outrageous if it is an abuse by the actor of a position in which he has actual authority over the other, or the power to affect the other's interests." Zalnis v. Thoroughbred Datsun Car Co., 645 P.2d 292, 294 (Colo. App. 1982). Conduct may also become outrageous where the defendant proceeds though he knows that the plaintiff "is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity." Restatement (Second) of Torts §46 cmt 1; see English v. Griffith, 99 P.3d 90, 93 (Colo. App. 2004).

23

156. Defendants committed 'Outrage' by threatening me, supra ¶5, conspiring to assault me, supra ¶34, assaulting me without justification while fully restrained, supra ¶¶ 15-25, 29, 14, violating any number of related policies and regulation in so doing, supra ¶ 151, and finally by fabricating an incident report against me ~~staff~~, supra ¶30, which subjected me to sanctions, see generally BOP Policy Inmate Discipline Program (containing sanctions for a "224" violation, i.e., assault on staff). They did this knowing I was on the 35th day of my hunger strike, supra ¶2, and because of that I was not only very physically fragile, but mentally infirm. Moreover, as a prisoner, I was in their custody the entire time, supra ¶1.

157. The Court should consider, Enright v. Groves, 560 P.2d 851 (1977), where outrage was found where an officer illegally arrested a woman, and twisted her arm even after she told him that her arm dislocates easily throwing her to the ground. See also Kirk v. Smith, 674 F.Supp. 803 (D. Colo. 1987) (stating a termination must be combined with other wrongful behavior such as physical assault, ridicule, humiliation to constitute an arguable claim of IIED); Wing v. JMB Prop. Manag. Corp., 714 P.2d 916, 918 (Colo. App. 1985); Orwat v. Maloney, 360 F.Supp. 2d 146, 65 (D. Mass. 2005) (False disciplinary charges may constitute IIED).

CLAIM THREE: Negligence / Gross Negligence
OR
Battery                THE LAW APPLIED

158. The U.S. had a duty to apply the restraints with due care. (Misfeasance)

159. The U.S. had a duty to conduct the two hour restraint checks with due care so as to correct wrongly applied restraints AND/OR relieve unnecessary suffering AND/OR remove circulation restricting medical tape causing pain and discoloration in arm. (Non-Feasance)

160. A duty exists from guards to prisoners to protect them from injury. Kikumura v. Osagie, 461 F.3d 1269, 1301 (10th Cir. 2006) (applying factors in Taco Bell, Inc. v. Lannen, 744 P.2d 43, 46 (Colo. 1987). Also the Tenth Circuit states, "Colorado law would impose a duty of care on prison officials to protect inmates' health and safety." Ajaj v. U.S., 293 F. Appx. 575, 81 (10th Cir. 2008). Moreover, a 'special relationship' exists between inmates and guards such as creates liability for non-feasance and it con-comitantly creates an affirmitive duty to act, Kikumura, 461 F.3d at 1301 ("clearly a 'special relationship' exists ... since [he] is dependent on and under the control of ADX prison and its staff."); Beach v. Univ. of Utah, 726 P.2d 413, 415 (Utah 1986) (affirmitive duty under 'special relationships'); Univ. of Denver v. Whitlock, 744 P.2d 54 (Colo. 1987) (same); see generally Restatement (second) of Torts §314A ("One who... takes... custody of another... such as to deprive... opportunities for protection is under a... duty to the other.").

161. The existance and scope of tort duties are questions of law. Metro Gas Repair Serv, Inc. v. Kulik, 621 P.2d 313 (1981). Legal duty is defined in terms of standard of care; the corresponding standard essential to the proper discharge of the duty may originate from a judicial decision or a legislative enactment Dare v. Sobule, 674 P.2d 960, 63 (Colo. 1984). Administrative regulations may provide evidence of the scope of a duty owed to a plaintiff; i.e., the standard of care, Gerrity Oil & Gas Corp v. Magness, 946 P.2d 913, 30 (Colo. 1987). Even where a "regulation does not define the applicable standard of care [negligence per se], it may none the less "be relevant evidence bearing on the issue of negligent conduct," Id. at 931 (quoting Restatement (Second) of Torts § 288D); See also Blue Flame Gas, Inc. v. Van Hoose, 679 P.2d 579, 91-92 (Colo. 1984) (holding that although compliance with administrative safety regulations did not establish due care, it was evidence of due care). See generally Schindor v. U.S., 661 F.2d 552 (6th Cir. 1981) (collecting cases) (distinguishing between regulations that show duty, i.e., negligence, versus those that show a breach of duty, negligence per se). Lastly, non compliance with such regulations may permit the trier of fact to find negligence. Magness, 946 P.2d at 932.

162. Proof of negligence requires that "there must be a duty imposed by law and breached by the defendant with resultant damages." Roessler v. O'Brien, 119 Colo. 222. To prove causation... the plaintiff must show by a preponderance of the evidence that the injury would not have occurred but for the defendant's negligent conduct." Kaiser Health Found. Health Plan of Colo. v. Sharp, 741 P.2d 714, 19 (Colo. 1987).

163. DUTY No. 1: The U.S. had a duty to apply the restraints with due care; The U.S.' scope of duty is defined in training directives and regulations/policies on how to 'Four-point' inmates, which likely exist in a document called the Correctional Services Manual, P 6500.11, and the Correctional Services Procedures Manual, P 5500.12. See supra ¶ 76. The U.S. breached that duty by cuffing my hands towards the keyhole, with my wrists facing away from my body. Supra ¶ 56. Damages and injuries were thereby proximately caused. Supra ¶¶ 60-64, 72-73, 138.

164. Even as a matter of tort law, where duty arises out of common law, the injury was "forseeable" because it was not authorized in training and policy, supra, the "liklihood of injury" was also forseeable and significant for the same reason, policy prohibits "improperly applied restraints", BoP Policy P5566-06 ¶ (b)(g)(3); also, "the magnitude of the burden of guarding against it" is nil because there is already a regulatory and policy mechanism in place addressing this issue of applying restraints, (i.e. (use of force and restraints directives), as far as "the consequences of placing the burden on the defendant", there are none for the exact same reason; lastly, there is no "social utility" in misapplying the restraints of a 'four pointed' inmate unable to help himself such as causes pain & suffering. See McMillan v. Hammond, 404 P.2d 549 (1965) (factors of duty); Lance v. Senior, 36 Ill. 2d 516 (1967) (cited in Turner v. Grier, 668 P.2d 356, 58 (Colo. App. 1971)) (same).

25

165. As a final argument on the "foreseeable" and "likelihood of injury" factors, at least in the Deliberate Indifference context, "standards or procedures may provide circumstantial evidence ~~and~~ that a prison healthcare gatekeeper knew of a substantial risk of serious harm" in situations for which they are given instructions. Mata v. Saiz, 427 F.3d 745, 57 (10th Cir. 2005). There is no reason why the various regulations and policies on restraints would not also render the injury "foreseeable" and "likely" to the defendant. See BOP Policy P5566.06 (6)(h)(3) ("ensure unnecessary pressure is not applied"), ("prohibited uses ... include ... unnecessary tightness, or improperly applied restraints"), ("All inmates placed in restraints should be closely monitored."), (6)(h)(4) ("carefully documented"), ~~and~~ ~~~~ (10)(d) ("check the inmate ... every fifteen minutes"), (10)(f) ("qualified health personnel shall ... assess the inmate"). These statements render risk and injury "foreseeably" and "likely".

166. A helpful case note is McDaniels v. U.S., 2020 U.S. Dist. LEXIS 124008, at #33 (C.D. Cal. Apr 27, 2020), where a breach of duty may have resulted when officers unnecessarily tightened the restraints and refused to loosen them.

167. DUTY No. 2: The U.S. had a duty to conduct the two-hour restraint checks with due care so as to correct wrongly applied restraints AND/OR relieve unnecessary suffering AND/OR remove circulation restricting medical tape causing pain and discoloration in arm.

168. The scope of this duty is defined by regulation and policy, see supra ¶ 161 (cases). The relevant regulations and policies are:
(a) "Restraints will only be applied for the purposes outlined in policy and in authorized methods." P5566.06 (2)(g)
(b) "Restraint[s] ... may not be used [as] a method of punishing an inmate" 28 CFR 552.22 (h)(1)
(c) "or in any manner which restricts blood circulation". Id. §(h)(2)
(d) or "[i]n a manner that causes unnecessary physical pain or extreme discomfort" Id.§(h)(3)
(e) "prohibited uses of restraints include ... unnecessary tightness, or improperly applied restraints" P5566.06 (6)(h)(3) (BOP's restraints policy).
(f) "Staff shall ~~ensure~~ ... ensure that the restraints are not hampering circulation and for the general welfare of the inmate." 28 CFR §552.24 (d); see also id. § (f) (same).

169. The defendant breached these duties by repeatedly refusing to reapply the restraints and remove the medical tape, supra ¶¶ 59-66, despite my obvious pain, cries for help and my circulation impaired discolored arm, supra ¶¶ 65, 67. The Defendant had a "duty to see that which is plainly visible," i.e., my pain and circulation issues in the discolored arm, but breached that duty by refusing to correct the issues. Clark v. Bunnell, 470 P.2d 42, 45 (Colo. 1970). See also McDaniels, supra (a relatively 'on point' case).

26

170. Even as a matter of common law duty, McMillan and Lance (Factors Finding Duty), the injury was "Foreseeable" and "likley" because of all the standards and procedures in place on restraint checks. See supra ¶165 (incorporating that argument here); see also supra ¶168 (relevant policies and regulations inferring the Forseeability and liklihood of injury). Moreover, my pain, cries for help, and the discoloration of my arm, supra ¶¶65, 67, indicated both of these Factors too. The rest of the Factors application is essentially the same as above, supra ¶164, with the slight modification that there exists no "social utility" in subjecting inmates to pain and injury by not reapplying restraints and removing medical tape to ensure relief and circulation in a timely manner.

171. As to BATTERY, these facts may also be construed as battery. See Millbrook v. United States, 2016 U.S. Dist. LEXIS 122890, at *24-32 (M.D. Pa Sep. 12, 2016) (holding that summary judgment was survived on a battery claim of tightening restraints that caused pain and circulation issues). I believe the Defendants conduct was either negligent in the most reckless fashion or intentional. Untill the facts bear out in discovery, i've asserted both claims I believe may meet the facts. See generally, White, 999 P.2d at 818 (battery without intent may be negligence).

172. Very briefly, the "~~arm~~ intending to cause harmful or offensive contact" White, 999 P.2d at 816, is found by the violation of various policies on applying restraints and checking restraints, see supra ¶¶ 163 (policy on cuffing), 168 (policies on prohibited uses and applications), all of which serve no 'penological interest' and therefore infer malice, see supra ¶¶ 145-146 (arguments on malice).

173. As to showing that "an offensive contact... results", see supra ¶¶ 60-61, 65-67.

## CLAIM FOUR: Negligence & THE LAW APPLIED

174. The U.S. had a duty to enter the cell to conduct the 15 min. restraint checks

27

175. Concerning the existence of a 'special relationship', duty, and its scope, I incorporate, supra ¶¶ 160-162, here. As to this specific claim, the scope of duty is defined by regulation and policy, supra. The policies are:

(1) "Staff shall check the inmate at least every fifteen minutes, both to ensure that the restraints are not hampering circulation and for the general welfare of the inmate." 28 CFR § 552.24 (d).

176. Staff, the Defendant, did all 15 minute checks from behind a door and at a distance of 15 feet, supra ¶¶ 128, 130, and was unable to assess my "circulation" or "welfare" from such a distance; thus, the defendant ~~and staff~~ did not exercise due care in conducting these checks.

177. Had the Defendant entered the cell to conduct the checks, the Defendant would have promptly reapplied the restraint and cut the medical tape as Lt. Ingram did "7-8 hours" later, Supra ¶ 61. Defendant would have done this for all the policy and regulation reasons cited above, supra ¶ 168 (policies/regulations on restraint use). Thus, Defendants breach of duty in not entering the cell to conduct the 15 minute checks is the 'proximate cause' of my injuries. My injuries are cited above, see supra ¶¶ 60, 65, 138.

178. As to the scope of duty arising out of common law, not regulations, I incorporate my arguments on ~~a~~ the finding of duty based on the factors cited above here. See supra ¶¶ 164-65, 170.

(Failure to render aid/refer)

## CLAIM FIVE: Negligence & THE LAW APPLIED

179. The U.S. had a duty to render aid during the 15 minute checks when I asked and cried for help, or otherwise refer.

28

180. The existence of a 'special relationship', duty, and its scope as it applies specifically to this claim is the same as the preceding claim, supra ¶175, I thus incorporate it here.

181. Staff breached their duty to "render aid" when they "refused" to address my circulation issues or to "call medical" or a "luitenant", despite my "scream[s]", Supra ¶¶ 74, 62. Had they rendered aid in accordance with all the policy reasons cited above, supra ¶ 168, my pain would have ended as it did "7-8 hours" later when Lt. Ingram reapplied the restraints and removed the medical tape, supra ¶61. Thus, Defendant's refusal to act 'proximately caused' my injuries, supra ¶¶60,65, 138 (injuries).

182. I incorporate my arguments on the finding of common law duty here, supra ¶¶164-65, 170.

183. I refer the Court to an 'on point' case cited before, McDaniels, 2020 U.S. Dist. LEXIS 12008, at *33. Also, failure to refer claims were found viable in Kikumura v. Osagie, 461 F.3d 1269, 1301 (10th Cir. 2006) (finding "duty of care [because of] his 'obvious' need for assistance, cries for help, and complete dependency on prison staff" thus "we have no doubt that 'reasonable persons' would have recognized a duty for officers... to call the prison infirmary.").

184. The Court may also consider the standards set out in Restatement of Torts (Second) §314(a) cmt. f, "[t]he defendant is not required to take any action until he knows or has reason to know that the plaintiff is endangered, or is ill or injured. He is not required to take any action beyond that which is reasonable under the circumstances," quoted in JGE v. United States, 2016 U.S. Dist. LEXIS 106745, at * fn.3 (D.N.M. Aug. 9, 2016).

29

# CLAIM SIX: IIED 2 THE LAW APPLIED

185. I incorporate the arguments and standards of IIED claims previously stated here, see supra ¶¶ 154-55, 157. I further add that "[w]hile it is true that courts are more likely to find outrageous conduct in a series of incidents or in a 'course of conduct' than in a single incident, it is the totality of the conduct that must be evaluated to determine whether outrageous conduct has occured. Zalnis, 645 P.2d at 294. Also "[t]he intensity and the duration of the distress are factors to be considered in determining its severity. Moreover, although severe distress must be proved, 'in many cases the extreme and outrageous character of the defendants conduct is in itself important evidence that the distress has existed.'" Estate of Trentadue v. United States, 397 F.3d 840, 56 (10th Cir. 2005) (quoting Restatement § 46 cmt. j).

186. The "defendant engaged in extreme and outrageous conduct", Pearson, 70 P.3d at 597, by misapplying the restraints and repeatedly refusing to relieve my extreme pain and suffering, supra ¶¶ 55-56, 59-67, 74. The fact that they did so repeatedly, supra ¶¶ 61-64, 66, 74-75, indicates that they had the "intent of causing the plaintiff severe emotional distress", Pearson; this "intent" is further deduced by the defendant's various restraint policy violations, supra ¶¶ 55-56, 168. As to the last element, I was caused "severe emotional distress", Pearson, by not only the physical torture, but the emotional after effects existing long after the abuse, supra ¶¶ 60-61, 67, 57, 138. Outrage exists here even more so because defendant is my custodian who has power over me, and who did this to me while I was 'four pointed' and especially helpless, Zalnis (abuse of power outrageous). Defendant did this knowing I was physically and mentally infirm due to a 42 day hunger strike, supra ¶ 43; this adds to the outrageousness too. English, 99 P.3d at 93. Lastly, this occurred over a "series of incidents," thus lending itself to outrage, from the initial misapplication to the repeated refusals to relieve my agony, supra ¶¶ 55-56, 61-64, 66, 74-75. Zalnis.

30

187. In Kikumura, 461 F.3d at 1301, claims of 'outrage' were found viable alongside similar claims of officers repeatedly refusing to call medical for an inmate in need of care.

## CLAIM SEVEN: Deliberate Indifference & THE LAW APPLIED

### As Against Lt. Kammrad In His ~~Individual~~ Official Capacity

188. A restraints claim is only viable if the restraints "exposed [the plaintiff] to great pain or that any of his discomfort [was] occasioned either deliberately, as punishment, or mindlessly, with indifference to his humanity." Fulford v. King, 692 F.2d 11, 15 (5th Cir. 1982); see also Smith v. Coughlin, 748 F.2d 783, 87 (2d Cir. 1984) ("Restraints ... do not violate the amendment unless they are 'totally without penological justification', 'grossly disproportionate', or 'involve the unnecessary and wanton infliction of pain'") (quoting Rhodes v. Chapman, 452 U.S. 337, 46 (1981)). Severe chest pain lasting hours due to failure to provide treatment satisfies the objective component because the Eighth Amendment forbids the "unnecessary/wanton infliction of pain." Sealock v. Colorado, 218 F.3d 1203, 10 (10th Cir. 2000). Pain and mental anguish from a healed wound that did not become infected, but was untreated, are actionable under the Eighth Amendment, which prohibits needless suffering. Gregg v. Wisconsin, 430 F.2d 1150, 54-55 (6th Cir. 1991), cited approvingly in, Mata v. Saiz, 427 F.3d 745, 55 (10th Cir. 2005). An official is deliberately indifferent if he "knows of and disregards an excessive risk to inmate health or safety". Farmer v. Brennan, 511 U.S. 825, 37 (1994). Refusal to loosen restraints may be malicious. Stevenson v. Cordova, 733 F. Appx 939, 43 (10th Cir. 2018).

189. The pain and suffering of the restraints was ignored by Lt. Kammrad, as was the medical tape that exacerbated the agony, supra ¶¶57-60, 63-64; this happened even though I told him about my pain, supra ¶69, therefore he knew of my pain and risk to my health and safety and was deliberately indifferent.

190. Confirming Lt. Kammrad's knowledge of the risk to my health and safety are the various policies and

31

regulations carefully governing the use and checking of restraints, not to mention the strict and plentiful documentation requirements. See supra ¶¶ 165 (incorporating BOP Policies), 168 (same). "[Publishing] requirements for healthcare ... certainly provide circumstantial evidence that a prison healthcare gatekeeper knew of a substantial risk of harm." Mata, 427 F.3d at 757.

191. Because there was no "legitimate penological interest" in not rectifying misapplied restraints, relieving unnecessary pain, and refusing to facilitate obstructed circulation, Lt. Kammrad's conduct "lends support to a[] constitutional violation." Escobar v. Mora, 416 F. App'x 806, 817 (10th Cir. 2012).

192. My pain satisfies the objective component, see supra ¶¶ 60-61, 57, 67, 158.

193. Lastly, "repeated examples of negligent acts which disclose a pattern of conduct" may add up to deliberate indifference. Ramos v. Lamm, 639 F.2d 559, 75 (10th Cir. 1986). For this I refer back to the allegations in my negligence claims against the U.S., which evinces just such a pattern. See supra ¶¶ 167-184 (Claims Three - Five).

## CLAIM EIGHT: Deliberate Indifference ~ THE LAW APPLIED

### As Against Lt. Ingram In His ~~████████~~ Official Capacity

194. I incorporate all of Claim Seven's arguments here, except one. Supra ¶¶ 188, 190-93.

195. As to Lt. Ingram specifically, he ignored the pain and suffering of the restraints and medical tape, supra ¶ 66, even tho I told him about my pain, supra ¶ 61, and even tho at this time my arm had begun to turn "blue and purple", supra ¶ 65, something he could clearly see. Therefore, he knew of my pain and the risk to my health and safety and was deliberately indifferent.

32

## CLAIM NINE: Declaratory Judgment & THE LAW APPLIED
### As Against the BOP

196. Under 28 USC § 2201, the Court should declare that a proper reading of 28 CFR § 552.22 (h)(3) "Restraint equipment or devices... may not be used... [i]n a manner that causes unnecessary physical pain or extreme discomfort", requires prison officials to loosen tight restraints or to re-apply improperly applied restraints lest they run afoul of the Eighth Amendment. The limit to this interpretation would be to loosen restraints untill a prisoner could free himself from them.

## CLAIM TEN: Declaratory Judgment & THE LAW APPLIED
### As Against Lt. Kammrad

197. Under 28 USC § 2201, the Court should declare that "Lt. Kammrad violated my Eighth Amendment rights by not re-applying the left restraint nor removing the medical tape on 7-2-21."

## CLAIM ELEVEN: Declaratory Judgment & THE LAW APPLIED
### As Against Lt. Ingram

198. Under 28 USC § 2201, the Court should declare that "Lt. Ingram violated my Eighth Amendment rights by not reapplying the left restraint nor removing the medical tape on 7-2-21 in a timely fashion."

## CLAIM TWELVE: Declaratory Judgment & THE LAW APPLIED
### As Against the Office of the Luitenant / Captain

199. Under 28 USC §2201, the Court should declare that "because I have never been placed in "soft restraints" before, pursuant to 28 CFR §552.24(a), I have the right to be placed in soft restraints."

## CLAIM THIRTEEN: Negligence / Gross Negligence
### OR
### Battery    ⓑ THE LAW APPLIED

200. Incorporated here are most of my previous battery arguments, supra ¶¶ 143-148, 151-152, as well as the Negligence & Battery arguments for claim Three (claim one), supra ¶¶ 158, 160-166, 168, 171.

201. NEGLIGENCE / GROSS NEGLIGENCE: The U.S. had a duty to apply the restraints with due care so as to observe the 'finger' or 'two finger' rule and avoid causing unnecessary pain.

202. Here, the scope of the duty is defined by officer training, directives, policies found within the Correctional Services Manual, P5500.11, the Correctional Services Procedures Manual, P5500.12, and customary law enforcement practice all of which require that restraints be applied with one or two fingers space between the cuff and the wrist. See generally Garey v. Langley, 2021 U.S. Dist. LEXIS 172744, at *n.214 (E.D. Ark. Sep. 15, 2021) (BOP officer states at trial, "I'll put my thumb kind of give it space. I'll go around and that thumb will keep [a] gap....") ; Kisskalt v. Fowler, 2014 U.S. Dist. LEXIS 163175 (D. Colo. Nov. 21, 2014) (similar); Anderson v. Shatters, 2014 U.S. Dist. LEXIS 230112, at *4 (D. Colo. Nov. 19, 2014) (similar but with police) ; Stevenson v. Cordova., 2016 U.S. Dist. LEXIS 137726, at *66 & n.45 (D. Colo. Oct. 4, 2016) (prison guard) ; Marsh v. Doe, 2011 U.S. Dist. LEXIS 2498, at *15,16 (D. Colo. Feb. 3, 2011) (nurse). Moreover, duty's scope is also defined by the various policies and regulations governing restraint application. See supra ¶ 168.

34

203. Again, as to the existance & scope of duty and 'special relationships', I incorporate my prior arguments here, supra ¶¶ 160-162, 163-166.

204. Here, because the Defendant did not use due care in applying the 'finger' rule, nor did Defendant loosen the restraints once I complained of tightness and pain, where my wrists were clearly swollen and lacerated having blue/purple indentation marks, he breached his duty. See supra ¶¶ 90, 93-94, 96. This breach proximately caused the injuries because they did not exist before his misapplication of restraints. Supra ¶¶ 91, 93-99. Also, my right wrist was fine, it was my left wrist that was targeted. Supra ¶¶ 92, 96.

205. The Defendant, the U.S. (by Kammrad) is also liable for the following battery claim committed by the U.S. (by Balsick and Quezada). See infra ¶¶ 210-216 (battery claim), as well as the attendant IIED claim, infra ¶¶ 217-221. Because Lt. Kammrad's negligence in applying the restraints was or may have been intended to provoke resistance, supra ¶ 97, or otherwise could have been foreseen to, and because such resistance would almost certainly lead to the 'use of force', and because 'use of force' situations can forseeably get out of hand and become excessive, and because Balsick is known to have assaulted me before, and because it is known that I sued Balsick before, and because Balsick is known to assault inmates, Balsick's assault was therefore forseeable, and a forseeable consequence of Kammrad's negligence. Therefore, Kammrad is liable for Balsicks actions, which are not a superceding cause of liability. The same applies to the attendant IIED claim. See Restatement (Second) of Torts § 448 cmt. b ("Intentionally Tortious or Criminal Acts Done Under Opportunity Afforded by Actor's Negligence", "When special grounds for anticipating criminal action by third person.").

206. A breach of duty may result when officers unnecessarily tighten the restraints and refuse to loosen them. McDaniels v. United States, 2020 U.S. Dist. LEXIS 24002, at *33 (C.D. Cal. Apr. 27, 2020).

35

207. BATTERY, here, may also be an appropriate cause of action based on the facts. I incorporate my prior battery argument here. Supra ¶ 171.

208. Addressing the elements, the "intending to cause harmful or offensive contact" prong can be found by violations of restraint rules on spacing, supra ¶ 93, refusing to loosen painful restraints on swollen lacerated hands, supra ¶¶ 90, 44, his immediately recent history of restraint misapplication, supra ¶¶ 95-96, his intention to "teach me a lesson" and target the vulnerable "left [wrist]", supra, and his intent to "provoke violent resistance", supra ¶ 97, ~~Bulsick/Quezada~~/White (elements of battery). The violations of the policies above, supra ¶ 93 (spacing), and those general restraint application directives, supra ¶ 162, indicate malice because violating policies and regulation serve no "penological interest". See supra ¶¶ 145-146 (arguments on inferring malice from policy violations)

209. As to the element of "an offensive contact... results", White, see supra ¶¶ 92, 93, 44.

## CLAIM FOURTEEN: Battery ) THE LAW APPLIED

210. I incorporate my prior battery arguments here. See supra ¶¶ 143-148, 151-153 (standards on battery, malice and relevant case laws).

211. Defendants Bulsick and Quezada intended "harmful or offensive contact", White, because I very briefly "non combatively" resisted, supra ¶¶ 100, 103; and then stopped without striking anyone, while fully restrained, supra ¶ 98, 102; however, Bulsick and Quezada continued the battery by choking me and either trying or not caring enough to consider that the force used could break my wrists, supra ¶¶ 104-108. Because I was "not moving" the entire time this happened, there is no penological need for this force, thus, it was "harmful or offensive". Additionally, the fact that the supervisor had to put an end to the use of force, indicates the officers went too far and were acting maliciously, see supra ¶ 109.

**212.** Malice is further shown by Defendants' violation of policies and regulations, all of which show that no 'penological interest' existed, i.e., malice existed. See supra ¶¶ 145-146 (incorporating them here). Specifically: Defendants violated

(a) 28 CFR§ 552.22 (c), because they used more force than "necessary to gain control", as I was fully restrained and not moving. Supra.

(b) 28 CFR§ 522.22, because they used force "to punish", as Lt. Kammrad may have tried to "provoke" the resistance, battery, supra ¶97, and "teach me a lesson", supra ¶96.

(c) P5566.06, because they used "physical violence [and] intimidation", I avert the same facts as I did directly above, supra ¶¶ 96-97.


**213.** Applying a higher Hudson standard to determine malice, supra ¶147, we see that

(a) there was no "need for force" because I was fully restrained, on the 42 day of a hunger strike and very weak, only non combatively resisted very briefly, then stopped, supra ¶¶102-103,108, 43. Moreover, even a supervisor had to tell staff to "control yourself", supra ¶ 109.

(b) the "relationship between that need and the amount of force used" falls in my favor because there was no 'need'. Moreover, using black boxed cuffs to crush hands towards forearms, which can easily break a wrist, is entirely too much force to use on a restrained prisoner in any circumstance, as choking should be as well. See supra ¶¶ 105-107.

(c) the "threat reasonably perceived" was nil for the same reasons stated above in Factor (a) of this paragraph. Moreover, further evidencing this is that Defendants later fabricated an incident report accusing me of kicking staff in order to justify the force, i.e., increase the 'threat' I posed, supra ¶¶ 130-132. The fact that it was expunged and I was found not guilty infers no 'threat' existed, nor any justification to batter me. The fact that Defendants felt the need to fabricate assault allegations shows they themselves did not feel my non combative resistance was threatening enough to clear them of using force.

(d) there were no "efforts made to temper the severity of a forceful response."

-37-

Thus, malice clearly exists under Hudson's test.

214. Defendants' conduct was malicious because the very reasons they gave for using force, that I kicked them, were found to be unsustainable by a Hearing Officer; in brief, I was found not guilty. Supra ¶¶ 131-132. Therefore, the force was clearly without just cause, excuse, or penological interest.

215. As to the "contact" element, that is met by the facts above. Supra ¶¶ 105-107. As to the damages, that is met by the facts cited above. Supra ¶¶ 105, 107, 115-120, 138.

216. Lastly, because Defendants Balsick and Quezada violated my Eighth Amendment rights by using excessive force, see, infra ¶¶ 225-229 (claims against staff), the Court should hold they committed battery, or elsewise an inference exists that they did.

## CLAIM FIFTEEN: IIED & THE LAW APPLIED

217. I incorporate previous IIED arguments here, supra ¶¶ 154-155, 185.

218. Here, the Defendants' "extreme and outrageous conduct", Pearson, consists of "provoking" resistance by misapplying the restraints, committing unnecessary battery on a vulnerable hunger-striker in full restraints & then again misapplying the restraints. Supra ¶¶ 97-98, 102-108, 121. All while Defendants had absolute power over me as my custodians, which adds to the "outrage". Zaleis. Moreover, they knew of my malnourished weakened and infirm hunger-strike condition, this also adds to "outrage". English. In addition, violating policies such as the "finger rule", supra ¶¶ 93, 121, and the use of force policies cited earlier, supra ¶ 212, show outrageousness. The violation of my Eighth Amendment rights by their excessive force and deliberate indifference, infra ¶¶ 225-229, are also outrageous.

Berefield, 241 F.3d 1267 (10th Cir. 2001)(violating ones constitutional rights in an 8th Amendment case is necessarily "outrageous and intolerable" conduct). Lastly, Defendants violation of two criminal statutes is outrageous. Firstly, they committed "simple assault", 18 USC §113(5); secondly, they made "False statements in a government matter", 18 USC §1001, see also 5 CFRS 2635.902(v), when they fabricated incident reports, supra ¶¶ 131-132. "[W]here a crime is imputed in a civil action, its existance may be proved by such evidence as would suffice to prove any other fact involved. That is, the result should follow the preponderance of the evidence." Brown v. Tourtelotte, 50 Pac. 195, quoted in Stone v. Union Fire Ins. Co., 107 P.2d 241, 45 (Colo. 1940).

219. As to engaging in the conduct "recklessly or with the intent of causing the plaintiff severe emotional distress", Pearson, the facts cited above suffice. Supra ¶¶ 96-97, 104-109 (force gratuitous). See also supra ¶ 205 (detailing Bulsicks Forseeable animosity towards me and prisoners).

220. As to the "severe emotional distress" being caused, Pearson, the above facts suffice. See supra ¶¶ 96, 99, 104-108, 115-118, 120-122, 125, 138.

221. I incorporate the cases cited above here. See supra ¶ 157 (wrongful behavior and battery sustain IIED claim)(False charges too)

## CLAIM SIXTEEN: Negligence & THE LAW APPLIED

222. I incorporate the legal standards cited above here. See supra ¶¶ 160-162 (duty, scope, proximate cause, special relationships). I also incorporate those sections on common law duty Factors here, supra ¶¶ 164-165 (showing duty exists in law, apart from regulation as argued elsewhere). Lastly, I incorporate those sections defining the scope of duty as to this exact issue per relevant regulations of the BOP. See supra ¶ 202 (itself also referring to ¶ 168).

39

223. The U.S. had a duty to apply the restraints with due care so as to observe the 'Finger' or the 'two finger rule' and avoid causing unnecessary pain.

224. Here, the U.S. breached that duty when they 'vice gripped' the right hand, supra ¶121, not paying attention to the space left between wrist and cuff, nor factoring in how my wrists were swollen, lacerated and had purple/blue indentation marks, supra ¶90, so as to be attentive in properly applying the cuffs and avoiding unnecessary pain. The breach proximately caused the injuries because there was no pain before the application, supra ¶99, the application caused the pain, supra ¶120, the nurse had to struggle to remove the wrist, supra ¶¶ 124-25, which resulted in immediate relief, supra ¶126. My injuries are cited above, see supra ¶¶ 120, 122, 125, 133, 138, these constitute damages.

## CLAIM SEVENTEEN: Excessive Force (Under 8th Amendment)
### As Against Balsick & Quezada In Their Official Capacities

225. In an excessive force case, "the core judicial inquiry is... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically cause harm." Hudson, 503 U.S. at 6-7. Force is "wanton" [malicious] when there is no need for it, U.S. v. Walsh, 194 F.3d 37, 50 (2d Cir. 1997); thus evidence an officer kicked a handcuffed person who was on the ground shows malice. Lewis v. Downs, 774 F.2d 711, 14 (6th Cir. 1985). I incorporate the malice case law cited supra, ¶¶ 146-47, here.

226. As to the law on injury, an "inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." Wilkins v. Gaddy, 559 U.S. 34, 38-39 (2010). There is "no need for significant or lasting

40

injuries" if the infliction of pain was wanton. <u>Northington v. Jackson</u>, 973 F.2d 1518 (10th Cir. 1992); <u>accord Despain v. Uphoff</u>, 264 F.3d 965 (10th Cir. 2001); <u>Felix v. McCarthy</u>, 939 F.2d 699, 702 (9th Cir. 1991); <u>Brooks v. Kyler</u>, 204 F.3d 102, 108-109 (3d Cir. 2000).

227. Where officers use excessive force together, their conduct is aggravated and each is liable for the others actions; <u>Bletz v. Gribble</u>, 641 F.3d 743, 54 (6th Cir. 2011), cited in <u>Walter v. Gomez</u>, 745 F.3d 405, 422 (10th Cir. 2014), <u>Estate of Booker v. Gomez</u>, 745 F.3d 405, 21, 22 (10th Cir. 2014). Thus, Balsick and Quezada's acts are aggravated for liability purposes.

228. I succinctly stated my subjective element arguments in my battery claim based on the same facts, supra ¶¶ 211-214, I incorporate them here to show malice. I'll only add relevant case law showing my claim's viability. See <u>Ali v. Duboise</u>, 763 F. Appx. 645, 51 (10th Cir. 2019)(prisoner cuffed, dragged and jerked by officers causing bruising, swelling and numbness stated claim); <u>Cavanaugh v. Woods Cross City</u>, 625 F.3d 661, 65 (10th Cir. 2010)(using taser 3 seconds longer than recommended on handcuffed prisoner, on ground and already subdued by multiple staff states claim); <u>Mitchell v. Maynard</u>, 80 F.3d 1433 (10th Cir. 1996)(restrained prisoner kicked); <u>Smallwood v. Renfro</u>, 708 F. Supp. 182, 88 (N.D. Ill. 1989)(choking and hitting prisoner in arm with radio); <u>Claudle-El v. Peters</u>, 727 F. Supp. 1175, 80 (N.D. Ill. 1989)(handcuffed, then choked, thrown to ground and kneed in back); <u>Watts v. Cnty. of Sacramento</u>, 65 F. Supp. 2d 1111, 14-20 (E.D. Cal. 1999)(lifting suspect by handcuffs). Here to fore, my facts are suggestive of Excessive Force.

229. I incorporate my damages argument here, to meet any objective component needed, as I previously stated in my battery arguments. See supra ¶ 215 (injuries based on same facts).

## CLAIM EIGHTEEN: Declaratory Judgment & THE LAW APPLIED As To Officers Balsick & Quezada

230. Under 28 USC §2201, the Court should declare that "Officers Balsick & Quezada violated my Eighth Amendment rights by using force on 7-2-21 on me while I was not resisting, nor a threat, and fully restrained on the 47 day of my hungerstrike."

## VARIOUS LEGAL POINTS & MISC.

231. IMMUNITY WAIVED: BOP officers are "law enforcement officers", McCarthy v. Madigan, 503 U.S. 140, 155 n.6 (1992); thus, immunity is waived for intentional torts under 28 USC §2680 (h).

232. PRIVATE ANALOG: Plaintiff's claims find private analog in private boarding schools, private mental hospitals, or even private hospitals and asylums, as well as private institutions for troubled youths. See generally Coffey v. U.S., 870 F.Supp. 2d 1202, 36 (D.N.M. May 5, 2012) (jail medical screening analogized to private hospital; private school); Sanchez v. U.S., 506 F.2d 702, 704-715 (10th Cir. 1974) (school liability only found if custodial like "a jail or asylum").

233. DISCRETIONARY FUNCTION EXCEPTION: The existence of a "fixed or readily ascertainable standard" means ones actions are not discretionary. Barton v. U.S., 609 F.2d 977, 79 (10th Cir. 1979). It is clear that if a duty is not mandatory or not clearly specified then it is discretionary." Weiss v. U.S., 787 F.2d 518, 23 (10th Cir. 1986).

42

The 'DFE' does not apply if a "Federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." U.S. v. Gaubert, 499 U.S. 315, 22-23 (1991). The "courts have read the Supreme Courts ['DFE'] cases as denying protection to actions that are unauthorized because they are unconstitutional...". Thames Shipyard & Repair Co. v. U.S., 350 F.3d 247, 54 (1st Cir. 2003) (citing cases). 28 USC § 4042 "imposes on the BOP a general duty of care [but] the BOP retains sufficient discretion in fulfilling that duty. [The] BOP has created program statements, institution supplements, and post orders to complete this statutory mandate." Cohen v. U.S., 151 F.3d 1338, 42 (11th Cir. 1998). "Actions taken to carry out a discretionary policy must be taken with sufficient caution to ensure that, at a minimum some other Federal law is not violated in the process." Johnson v. Sawyer, 980 F.2d 1490, 1503 (5th Cir. 1992).

## ∼ The 'DFE' Is Inapplicable As To: ∼

Claim Three: because training and policy prohibit the 'issue' application of restraints, such as is detailed in documents in the BOP's sole possession. See PS 5566.06 (2)(g) (indicating existence of method); (4)(h)(3) (same by stating, "prohibited uses...include...improperly applied restraints"). Also, I was supposed to be placed in "soft restraints". Id. at (10).

Moreover, as to Duty No. 2 of Claim Three, the 'DFE' doesn't apply because Defendant violated the parallel constitutional right based on same facts. Supra ¶¶ 188-195 (claims seven, eight). Also, staff violated the mandatory directives in policy/regulation, See PS 5566.06 (2)(e),(g) (they used cuffs to harm and in unauthorized way); (6)(3) (violated rules on spacing making cuffs "unnecessarily tight" and used then "improperly applied"). See also 28 CFR § 552.22(h)(1)-(3); 552.24 (a), (f) (failed to ensure that my circulation wasn't "impaired").

Claim Four: because 28 CFR § 552.24 (d) required staff to check my circulation, the cause of my pain, and at which they refused/failed. Also, that regulation required them to abide by 28 CFR § 552.22 (b)(2), (3), which they also failed. Specific mandates and guidance is in BOP privately kept documents.

Claim Five: because Defendant violated 28 CFR § 552.22 (b)(3) and 28 CFR § 552.24 (d)

Claim Thirteen: because Defendant violated the 'Finger rule' used in training and existant in documents in the BOP's sole possession, and used the cuffs in violation of 28 CFR § 552.22 (b)(1), (3); 552.24 (a), and P5566.06 (b)(5) ("unnecessarily tight[]", "improperly applied"). The details about all proper and mandated exclusive restraint use exist in BOP documents in their sole possession.

Claim Sixteen: same as Claim Thirteen.

234. All claims of Negligence are NOT Negligence Per Se; they are ordinary negligence claims.

235. Forgetting to double lock handcuffs, causing them to tighten is not "based on social, economic, or political policy considerations". Dykstra v. United States Bureau of Prisons, 140 F.3d 791, 95 (8th Cir. 1441) ('DFE' inapplicable). The 'DFE' "would not apply [where guards] tightened the shackles so tight he caused the leg restraints to cut 4 deep lacerations into both of [his] legs." Cascella v. U.S., 2022 U.S. Dist. LEXIS 156502, at *11 (M.D.Pa. Aug. 30, 2022).

44

**E.    PREVIOUS LAWSUITS**

Have you ever filed a lawsuit, other than this lawsuit, in any federal or state court while you
were incarcerated? _X_ Yes ___ No (*check one*).

*If your answer is "Yes," complete this section of the form. If you have filed more than one
previous lawsuit, use additional paper to provide the requested information for each previous
lawsuit. Please indicate that additional paper is attached and label the additional pages
regarding previous lawsuits as "E. PREVIOUS LAWSUITS."*

Name(s) of defendant(s): D.S., Babsick, Craig Johnston, Moncz, Fernandez, Melvin, Storika, Levi

Docket number and court: 13-CV-01677-KMT

Claims raised: Negligence, Battery, IIED, Deliberate indifference, Excessive Force, Assault

Disposition: (is the case still pending?
has it been dismissed?; was relief granted?) Private Settlement / Voluntary dismissal

Reasons for dismissal, if dismissed: Settlement

Result on appeal, if appealed: N/A

**F.    ADMINISTRATIVE REMEDIES**

*WARNING: Prisoners must exhaust administrative remedies before filing an action in federal
court regarding prison conditions. See 42 U.S.C. § 1997e(a). Your case may be dismissed or
judgment entered against you if you have not exhausted administrative remedies.*

Is there a formal grievance procedure at the institution in which you are confined?

        _X_ Yes ___ No (*check one*)

Did you exhaust administrative remedies?

        _X_ Yes ___ No (*check one*)

45

## G.    REQUEST FOR RELIEF

*State the relief you are requesting or what you want the court to do.  If additional space is needed to identify the relief you are requesting, use extra paper to request relief.  Please indicate that additional paper is attached and label the additional pages regarding relief as "G. REQUEST FOR RELIEF."*

☒ Monetary & Nominal ~~damages~~

☒ The DECLARATORY relief requested above, *supra* ¶¶ 146-149, 230.

☒ Injunctive relief:

#1 To require at every two hour restraint check a camera record the condition of an inmates wrists and legs.

#2 To categorically prohibit in policy all chokeholds on inmates who are mechanically restrained.

#3 To require all application of restraints pursuant to any use of force and/or PS566.06, be done on camera with the camera clearly capturing the application of the 'finger rule' for inmate and staff protection and later review.

#4 To provide additional training on the proper application of restraints.

#5 To place a "soft restraint" order in my file.

## H.    PLAINTIFF'S SIGNATURE

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

_____
(Plaintiff's signature)

_____2-15-23_____
(Date)

(Form Revised December 2017)

6

US DISTRICT COURT FOR THE DISTRICT OF COLORADO

ABDO, plaintiff v. United States, et al,   Case 1:22-cv-03110-CNS-NRN

Plaintiff's First Set Of Production Requests On Defendant(s)

Pursuant to D.C. COLO. L.CivR.5.3(b) this Request is filed; and,
Pursuant to Fed.R.Civ.P.34 this Request is tendered.
Pursuant to Rule 34, Fed.R.Civ.P., Plaintiff requests that Defendant(s)
produce the documents listed within 30 days of service of this Request in
paper form. (Please see enclosed instructions.)

Directed Production To The United States:

① All documents, records, and ESI, except metadata, generated by the B.O.P,
or its employees, as a result of the hunger strike assessment, and use of force
by officers on Plaintiff, which occurred on 6-25-21, to include but not
limited to, all disciplinary records produced or generated pursuant to B.O.P program
statement Inmate Discipline, such as relates to the events of 6-25-21.

② All documents generated under the following designations as a result of any
event that occurred on 6-25-21, or originated out of it, where Plaintiff or
any participant in the hunger strike assessment, use of force, or consequent

2

disciplinary-proceeding's process is the subject, or otherwise mentioned therein.

(a) BP-E583 reports

(b) BP-S6.717.055 reports

(c) BP-5078.055 reports

(d) BP-E586 reports

(e) BP-S716.012 reports

(f) BP-S774.012 reports.

(g) BP-S71-A BP-A0504 reports

(h) SF-660 reports

(i) BP-A0714 reports

(j) BP-A0713 reports

(k) BP-A0717 reports

③ All documents generated and/or considered by the North Central Regional
Office's Counsel or, if other than him, the deciding authority, in the
disposition/review of Plaintiff's tort claims, TRT-NCR-2022-02406
& TRT-NCR-2022-02407. This includes ESI too.

④ A copy of all incident reports written by BOP employee E. Roberts
for violations of "prohibited act code" 224 (Redacting inmates personal data is ok)

⑤ The ADX, C-Unit, C-Lower videos from the 2 cameras from 4-3 pm
on 6-25-21.

3

⑥ Any and all policies, directives, instructions, manuals, post-orders, institutional supplements, memorandums, or training documents that provide guidance on dealing with assaultive or aggressive inmates at FCC Florence, such-as-was-in-effect on 6-25-21.

⑦ The full report/findings of any DOJ or DOJ subcomponent inquiry/investigation into the ADX, where such examines the use/application of restraints or the hunger strikes that occurr. Such report/findings are sought as has been finalized between 2016 thru 2022.

⑧ The 'records index' used by ADX record-custodians in finding & identifying records & documents as well as other reference material used toward the same ends. This 'index' is likely the same referenced in FOIA statutes and is agency specific.

⑨ Documents relating to the nature of ADX' stationary-camera-network only in-so-far as it informs;
① As to the nature & scope of its default-video-preservation-capacity;
② As to the nature & scope of any backup video-storage-systems;
③ As to how far back in time the system/network allows one to look and to review footage; and
④ As to the circumstances in which video will be preserved.

4

(10) The documents contained in my central files FOIA section. ^exempt

(11) All documents, records, and ESI, except meta data, generated by the BOP, or its employees, as a result of the hunger strike, assessments by medical, restraint checks, and uses of force that occurred on 7-2-21 from 5 am thru 7-2-21 at 8 pm, too include but not limited to; all disciplinary records produced or generated pursuant to BOP Program Statement; Inmate Discipline Program, and arising out of events that occurred on 7-2-21 (All at the ADX.)

(12) All stationary & hand held camera footage produced (generated on 7-2-21 at 5 am thru 7-7-21 at 10 am by any BOP employee at the ADX where I, Naser Abdo, am the inmate involved. This includes the two stationary cameras in the Medical cell and all handheld footage produced by staff.

(13) All documents generated under the following designations as a result of any event that occurred on 7-2-21, or originated out of it, where Plaintiff or any participant in a medical assessment, use of force, or consequent disciplinary proceedings/process is the subject, or otherwise mentioned therein.

    (a) BP-ES83 reports

    (b) BP-S0.717.055 reports

    (c) BP-S0.718.055 reports

    (d) BP-ES86 reports

5

(e) BP-5716-012 reports

(f) BP-5774-012 reports

(g) BP-A0304 reports

(h) SE-600 reports

(i) BP-A0769 reports

(j) BP-A0713 reports

(k) BP-A0717 reports

(14) A copy of all incident reports written by BOP employee Law for violations of "prohibited act code" 224 (this, like Request No. 4, includes violation 224a). (Redacting inmates' personal data is ok).

(15) A copy of all incident reports written by BOP employee Balsick for violations of "prohibited act code" 224 or 224a. (Redacting inmates' personal data is ok).

(16) Any and all policies, directives, instructions, manuals, post orders, institutional supplements, memorandums, or training documents that provide guidance on managing inmates in "ambulatory" or "four point" restraints, too include but not limited to those on applying restraints, checking restraints, and circulation. Further identified, is all information relevant to this Request that exists in the Correctional Services Manual and the Correctional Services Procedures Manual, as was in effect on 7-2-21 at FCC Florence.

6

(17) All progress-reports, performance-evaluations, and disciplinary-histories of Officer Balsick from 1-1-16 thru 12-31-21.

(18) All documents and ESI generated or produced as a result of my grievances against Balsick and others concerning the 7-2-21 incident. The remedy number is (1088509).

(19) All grievances (BP-8" thru BP-11") filed against Balsick by inmates from 1-1-15 thru 12-31-21 alleging any form of mistreatment or discrimination. (Personal inmate information may be redacted).

(20) The written communications of Balsick, Quezada, Kammrod and Law, two include personal texts, personal emails, and BOP domain emails, from 7-2-21 at 12:00am thru 7-3-21 at 12:0 11:59 pm. (They may be redacted for private third party information, but reasons must be given).

(21) All Documents and ESI, except meta-data, such as policies, directives, instructions, manuals, post-orders, institutional supplements, memorandums, or training-documents that provide guidance on "cuff-spacing", the "finger-rule", or the "two-finger-rule", such as was in effect at FCC Florence on 7-2-21.

(22) All emails in Warden True's, Captain Root's, Lt. Caldwell's, Lt. Wade's, Lt. Hand's, Jones's (SIS), SIS Keller's, Lt. Lopez's, Lt. Kammrod's, Lt. Ingram's, Dr. Garber's, Nurse Dunn's, Lt. Medrano's, Nurse Nott's

7

Officer Balsick's, Officer Law's or Officer Quezada's BOP domain email accounts that were sent or received between 7-2-21 at 12 am thru 7-31-21 at 11:59 pm that contain any relevance to me, for example, such as contain any of the following Keywords

- Abdo or Abdu
- Naser or Nasir
- 30882280 or 30882-280
- "Hunger strike" or strike
- "medical observation"
- "staff allegation" or "staff misconduct"
- Misconduct or Assault or Choke* (any derivation of choke)
- Investigate* (same)
- "Medical assessment" or "Force feed" or Feed
- IV
- Suspend* or Fire*

Each query should be searched for alone, the results will likely pertain to me and be relevant.

(23) All documents or ESI, except metadata, you rely on to prove that the use of force on 7-2-21 at ADX against me was justified.

Naser Abdo, ~~Naser Abdo~~    2-16-23

USP Max, PO Box 8500, Florence, CO, 81226

## US DISTRICT COURT FOR THE DISTRICT OF COLORADO

ABDO v. United States, et. al, ||| Case No. 1:22-CV-03110-CNS-NRN
plaintiff    defendant

## Plaintiff's First Set Of Interrogatories On Defendant(s)

Pursuant to D.C. COLO. L.Civ.R.5.3(b), this Request is Filed.
Pursuant to Fed.R.Civ.P.33, this Request is tendered.
Pursuant to Fed.R.Civ.P.33, Plaintiff requests that Defendant(s)
respond or otherwise object, to these interrogatories within 30 days of
service of this Request. (Please observe enclosed instructions & definitions.)

## Directed Interrogatories To The United States

① Please identify each person interviewed about the 6-25-21 use of force
on Plaintiff, and about the subsequent disciplinary proceedings against Plaintiff,
even if such person just gave a statement without prompting or a Formal
interview, including such interviews that were investigatory in nature. Then,
as to each person, identify the;

    ⓐ date of interview(s),

    ⓑ substance of interview(s),

    ⓒ method of interviews' transcription,

2

ⓓ the regulatory, policy, or statutory authority under which the interview(s) were taken, and

ⓔ follow up actions taken in response to the interview(s), if any.

② Please identify the names, titles, and job descriptions of any and all participants in the use of force & hunger strike assessment of Plaintiff on 6-25-21.

③ Please identify and describe in detail the responsibilities and duties of Officer E. Roberts during the assessment, & as a member of the use of force team, of Plaintiff on 6-25-21.

(Directed To US, But For Roberts)

④ Please describe in detail, in your own words, with reference to the time date stamps on the use of force video concerning the 6-25-21 incident, exactly where you are, what you are doing, and exactly when it is that you allege I kicked your arm, from the beginning to the video's end.

⑤ Please identify each person interviewed about the 7-7-21 use of force against Plaintiff, and about the subsequent disciplinary proceedings/process initiated against Plaintiff, even if such person just gave a statement without prompting or a formal interview, including such interviews that were investigatory in nature. Then, as to each person, identify the;

(a) date of interviews

3

(b) substance of interview(s),

(c) method of interviews' transcription,

(d) statutory, regulatory, or policy authority under which the interview(s) were taken, and

(e) Follow up actions taken in response to such interviews, if any.

(6) Please identify the names, titles, and job descriptions of any and all participants in the use of force & hunger strike assessment of Plaintiff on 7-2-21.

(7) Please describe in detail, and identify any sources based on which you rely to answer this Request, the full meaning of the following phrases, which is to say, what applications and/or methods they encompass and what they do not.

(a) "checked" within the meaning of PS5566.06 (2)(e),

(b) "authorized methods" within the meaning of PS5566.06 (2)(g),

(c) "a manner that causes unnecessary physical pain or extreme discomfort" within the meaning of 28 CFR§552.22 (h)(3),

(d) "proper application of restraints" within the meaning of PS5566.06(6)(h)(3)

(e) "improperly applied restraints" within the meaning of PS5566.06 (6)(h)(3),

(f) "Staff shall...ensure that the restraints have not restricted or impaired the inmates circulation" within the meaning of 28 CFR§552.24(F).

4

⑧ Do the acts proscribed in the following policy/regulatory references fall within the gambit of officer discretion? If so, please describe in detail, in your own words, why and how.

(a) "An employee may not use brutality, physical violence, or intimidation towards inmates...." P5566.06(1),

(b) "Force may not be used to punish an inmate." 28 CFR§ 552.22 (b),

(c) "Restraint equipment or devices ... may not be used ... [a]s a method of punishing an inmate." Id. §(h)(1),

(d) "Restraint equipment or devices ... may not be used ... in any manner which restricts blood circulation...." Id. §(h)(2)

(e) "Restraint equipment or devices ... may not be used ... [i]n a manner that causes unnecessary physical pain or extreme discomfort..." Id. §(h)(3)

(f) The "prohibited uses of restraints include ... improperly applied restraints." P5566.06(6)(h)(5),

⑨ Is it your contention that restraints applied to cause pain to an inmate with a disregard for his agony are outside the scope of authorized "purposes," within the meaning of P5566.06(2)(g), so as to be prohibited and non-discretionary. If not, please describe in detail why not and cite to any authority upon which you rely.

⑩ Please describe in detail, in your own words, what action an officer of the BOP must take if, when doing a restraint check, he finds a four pointed inmate's arm bluish/purpleish and constricted with medical tape, in

5

order to fulfill all dictates and guidance in PS566.06.

⑪ Please state in detail the full and complete meaning of "sound correc-tional judgment", within the meaning of PS566.06 (6)(h)(3); also, please describe in detail 3 different examples of what is not "sound correctional judgment", or otherwise define the phrase "unsound correctional judgment." Please identify any document upon which you rely.

⑫ Please identify when and under what circumstances Plaintiff was placed in "soft restraints", and further state the reason he was removed from "soft restraint status". Please identify each piece of evidence you rely on in responding to this Request.

⑬ Please identify every document referencing the circumstances under which any kind of chokehold or bloodchoke or neck constriction is permitted or disallowed, too include but not limited to any att and all use of Force training pursuant to PS566.06 (16) and the relevant portions of the Correctional Services Manual, and Correctional Services Procedures Manual. This Request is limited in scope to those existing on 7-2-21 and applicable to FCC Florence operations.

(Directed To United States For Kamrad)

⑭ Normally, Mr. Kamrad, if a four-pointed inmate is in a lot of pain due to one of his restraints, what is your common practice and response to this situation and why? Please describe in detail your response.

6

⑮ (Directed To United States For Ingram)

Normally, Mr. Ingram, if a four pointed inmate is in a lot of pain due to one of his restraints, what is your common practice and response to this situation and why? Please describe in detail your response.

(Directed To United States For Bulsicks)

⑯ Please describe in detail where you are and what you are doing over the entire course of the handheld camera video taken on 7-2-21 during the issue use of force referencing any available date-time stamp or second/ minute marker used to indicate ones location at any time in a particular video.

(Directed To United States For Quezada)

⑰ Please describe in detail where you are and what you are doing over the entire course of the handheld video taken on 7-2-21 during the issue use of force referencing any available date-time stamp or second/minute marker used to indicate ones location at any time in a particular video.

~~⑱ Please describe in detail how during the 15 minute restraint checks~~ (crossed out)

⑱ Please describe in detail how during the 15 minute restraint checks on 7-2-21, staff were able to ensure that the restraints were not "restrict[ing] blood circulation" or "improperly applied" while the checks were conducted from behind a window approximately 15 feet away from Plaintiff. 28 C.F.R § 552.22 (h)(2); P5566.06(6)(h)(2).

Naser Abdo, _Naser Abdo_    2-16-23

USP Max, PO Box 8500, Florence, CO, 81226

# Instructions

① Please set forth verbatim the text of each of the following interrogatories or requests before responding.

② When you are providing documents, please segregate or otherwise identify the documents by the paragraph number, and/or subsection number, in response to which the documents are being produced.

③ If any document does not exist, state this please. If the document once existed but has been lost, destroyed, or altered, or is no longer in your possession or control, please identify the document and describe the following:
its author; the recipient or addressee; the subject matter and contents thereof; who now possesses the document; the date and circumstances surrounding, or reasons for, its destruction; who authorized its destruction; who was the last known custodian of such document; and who has knowledge of the loss or destruction of the document.

④ The relevant time period for the interrogatories and requests for production of documents shall be, unless stated otherwise in the interrogatory or request, the entire

time period to which the allegations in the operative complaint relate.

⑤ The following interrogatorries and requests are continuing. If events occur or information becomes available after service of your responses to the following requests that would affect your responses, your responses should be supplemented as required by Fed. R. Civ. P. 26(e).

⑥ When asked to produce a document or to respond to an interrogatory, the request is for information within your actual or constructive possession, custody, or control. Your answers must therefore include not only information available to you, but also that information available to anyone who is assisting you with this litigation, or subject to your control or supervision, or acting on your behalf.

⑦ All interrogatories must be answered seperately and fully in writing and under oath within 30 days of service, and requests for documents must be produced within 30 days of service.

# Definitions of Common Words

① "You," "your," or "Defendant(s)" means all individual Defendants, unless otherwise identified, as well as the United States, its agents or instrumentalities; it also includes anyone who is assisting you with this litigation, or subject to your control or supervision, or acting on your behalf, or the person(s) who are responding to these requests.

② "Document(s)" means any record of any kind contemplated by the Federal Rules of Civil Procedure whether private or public, written, graphic, pictorial, photographic, phonographic, mechanical, taped, electronic, digital or otherwise, and every non-identical copy, now or formerly in your possession, custody, or control, but not including metadata unless asked for expressly. Different versions of the same documents, such as different copies of a written record bearing different handwritten notations, are different documents within the meaning of the term used. In case originals or original non-identical copies are not available, "document" includes copies of originals or copies of non-identical copies, as the case may be.

③ "Identify", means the following:

ⓐ When referring to a person, "identify" means to state the persons full name, last known work address, telephone number (if not otherwise informally objected to) present or last known employer, and that person's position and job description at the time in question with respect to the particular interrogatory involved.

ⓑ When referring to any person other than a natural person, "identify" means to state its legal name and the address of its principal place of business.

ⓒ When referring to a document, "identify" means to state the type of document, its nomenclature or any other means of identifying the document in a records index, its title or subject matter, the documents date, and the identity of the author, sender, and recipients of the document.

ⓓ When used in reference to a location, "identify" means to state its full name, address and telephone number.

④ "Communication" means the transmittal of information by any means and includes communications of any kind, whether oral, written, electronic or otherwise

⑤ "Describe", "detail", "describe in detail", or "state with specificity" means to provide with respect to any act, occurrence, transaction, event, statement, communication, or conduct [hereinafter collectively "act"] all facts concerning any such act, including but not limited to, a description of each act, the date, the location, and the names and addresses of all persons involved.

⑥ "Concerning", "regarding", "relating to", "referring to", "addressing", and "describing" means relating to, referring to, reflecting, addressing, describing, evidencing, discussing, analyzing, studying, or constituting in any way whatsoever.

⑦ "Or" shall not be construed to limit any response or production between two or more points of inquiry where any relevant information exists between said points of inquiry.

⑧ "Each" means each and every.

⑨ "Known to you," "knowledge of," "aware of," and any similar phrase means all matters known to you, as well as anyone who is assisting you with this litigation, or subject to your control or supervision, or acting on your behalf.

(10) In interpreting any aforementioned terms or any terms mentioned in the requests, references to the singular should be read to include the plural, and vice versa. Verbs shall be construed as though they were in the past, present and future tense.

# DECLARATION OF SERVICE, MAILING & MISC #8

I, Naser Abdo, DECLARE under penalty of perjery that the following is true & correct:

1) On _____ (date), I recieved the following document(s), record(s) or other tangible thing(s) stated below from, _____ (persons name if known), by _____ (legal mail, delivery, Personal mail, etc.....).

A)
B)
C)
D)
E)

2) On 2-22-23 (date), I mailed the following document(s) or record(s) stated below by the current legal mail procedures in effect by handing the sealed and properly stamped envelope(s) to prison official, _____ (name if known), for post. The address printed on the envelope(s) was as follows.

A) Motion Seeking Leave To Amend If Necessary
B) Declaration #8
C) Second Amended Complaint
D) Pl's First Set Of Production Reqs. ; Pl's First Set Of Interrogatories

Address(es): Clerks Office, US District Court, Alfred Arraj, US Courthouse, Room A105, 901-19th St., Denver, CO, 80294-3589

3) I am expecting but have not yet recieved the following document(s) or record(s) or tangible thing(s).

A)                    C)
B)                    D)

| Declarants Address: US Penitentiary Max, PO Box 8500, Florence, Colorado, 81226 | Name: Naser Abdo    Number 80882-2-80 |
| | Signature: Naser Abdo |
| | Executed on 2-22-23 (Date) |



CERTIFIED MAIL®

7021 0950 0000 2051 7739

((( legal mail )))

Clerks Office,
US District Court,
Alfred Arraj US Courthouse,
Room A105,
901-14th st.,
Denver, CO,
80294-3589

((( NCMTE
Mailed
2-72-23 )))

Name: NASER ABDO
Reg No: 30938-20
U.S. Penitentiary MAX
P.O. Box 8500,
Florence, CO. 81226-8500



FEDERAL PRISON CAMP
P.O. BOX 5000
FLORENCE, COLORADO 81226

DATE: _____

FEB 2 7 2023

"SPECIAL LEGAL MAIL"

The enclosed letter was processed through special mailing
procedures for forwarding to you. The letter has neither
been opened nor inspected. If the writer raises a question
or problem over which this facility has jurisdiction, you may
wish to return the material for further information or clarification.
If the writer encloses correspondence for forwarding to another
addressee, please return the enclosed to the above address.